EISENBERG & BAUM, LLP
Andrew Rozynski, Esq.
32 Union Square East, Penthouse
New York, New York 10003
(212) 353-8700
arozynski@eandblaw.com
Attorneys for Plaintiff Rachel Bronwyn

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RACHEL BRONWYN,<br><br>Plaintiff,<br><br>v.<br><br>MUNICH AIRPORT NJ LLC and THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY,<br><br>Defendants. | Civil Action No. 26-14562<br><br>**COMPLAINT AND JURY DEMAND**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AND JURY DEMAND

Plaintiff Rachel Bronwyn, who resides at 6432 Jasper Way, Carlsbad, California 92009, by and through her undersigned counsel Eisenberg & Baum, LLP, brings this action against Defendants Munich Airport NJ LLC, whose principal place of business is Terminal A, Newark Liberty International Airport, Newark, New Jersey 07114, and the Port Authority of New York and New Jersey, whose principal place of business is 4 World Trade Center, 150 Greenwich Street, New York, New York 10007, and alleges as follows.

## I. INTRODUCTION

1. On November 11, 2025, Rachel Bronwyn flew from San Diego to Newark to visit a friend and the Princeton University Art Museum. Inside the secure area of Terminal A at Newark Liberty International Airport, she entered the accessible restroom with the adult changing table

near Gate A28. She uses a wheelchair because she has primary progressive multiple sclerosis. She expected the restroom to do what an accessible airport restroom is built to do: open, close, and open again under her own hand.

2. It did not. The interior latch would not release. Ms. Bronwyn pressed the emergency call button beside the door repeatedly and repeatedly pulled the emergency cord on the same panel. No one answered through the intercom. She called 911, and the dispatcher wanted to know why she was calling at 4:55 p.m. when her flight had arrived at about 3:23. Through the door she could hear a crowd assembling, a conversation about a key that nobody could find, and laughter. Port Authority Police eventually pried the door open with a crowbar. She came out roughly ninety minutes after she had first tried to leave, into a crowd of at least twenty people, airport employees and police officers among them.

3. Later the same day, Ms. Bronwyn showed the Terminal A duty manager, Tanika C. Whittaker, a different defect in a single-user accessible restroom beside the duty manager's own office: the toilet paper dispenser had been mounted flush against the grab bar, leaving no clearance and no way to grip the bar. She had Ms. Whittaker sit down on the toilet seat so that Ms. Whittaker would understand the problem. Ms. Whittaker repeatedly assured her that it would be fixed. Six months later, on a return trip in May 2026, Ms. Bronwyn found a toilet paper dispenser mounted the same way against the grab bar in the women's restroom at Gate A14. An employee of Munich Airport NJ LLC, Jonathan Cruz, responded. A second employee of that company, identified as Cynthia, examined the dispenser, confirmed the violation, and photographed it. At Ms. Bronwyn's request, a male employee, Carlos, checked the men's restroom directly across the corridor and reported the identical condition there. Half a year after

Ms. Bronwyn had shown the condition in person to the terminal's own duty manager, the same condition was still present in the terminal, in two more restrooms.

4. The two Defendants occupy different positions with respect to Terminal A, and each is answerable for its own. The Port Authority of New York and New Jersey is the bi-state agency that operates Newark Liberty International Airport under a long-term lease and controls Terminal A, which it developed and paid for and had designed and built. Munich Airport NJ LLC operates Terminal A under an agreement with the Port Authority, with responsibility for operations, concessions and maintenance management at the terminal.

5. Ms. Bronwyn brings claims under Title II and Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the New Jersey Law Against Discrimination, and New Jersey common law. She seeks compensatory damages, punitive damages against Munich Airport NJ LLC under the Law Against Discrimination, declaratory and injunctive relief that includes a survey of Terminal A's public restrooms and remediation of the violations identified here, and attorneys' fees and costs.

## II. JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331. The Complaint pleads federal causes of action under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

7. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's claims under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., and under New Jersey common law, because those claims arise from the same events and form part of the same case or controversy under Article III.

8. Venue is proper under 28 U.S.C. § 1391(b)(2). A substantial part of the events and omissions giving rise to these claims occurred at Newark Liberty International Airport, in this District.

9. Each civil case is allocated by the Clerk of the Court to Camden, Newark or Trenton when it is commenced, on consideration of "the residence of the defendant, the convenience of litigants, counsel and witnesses, and the place where the cause of action arose." L. Civ. R. 40.1(a). Each of those considerations points to Newark. The events giving rise to these claims occurred at Newark Liberty International Airport, Munich operates Terminal A there, and the Terminal A personnel and records relevant to this action are there.

10. The Port Authority is amenable to suit in this Court. New York and New Jersey have consented to "suits, actions or proceedings of any form or nature at law, in equity or otherwise" against the Port Authority, N.J.S.A. 32:1-157; N.Y. Unconsol. Law § 7101, and have consented to its liability "for tortious acts committed by it and its agents to the same extent as though it were a private corporation," N.J.S.A. 32:1-162; N.Y. Unconsol. Law § 7106.

11. N.J.S.A. 32:1-163 and N.Y. Unconsol. Law § 7107 condition the consent on commencement of suit within one year after the cause of action accrues and, in an action for the recovery or payment of money, on service of a notice of claim upon the Port Authority at least sixty days before suit is commenced. N.J.S.A. 32:1-164 and N.Y. Unconsol. Law § 7108 prescribe the notice's contents and manner of service.

12. On or about June 12, 2026, Plaintiff's counsel sent a written notice of claim by certified mail, return receipt requested, addressed to Amy H. Fisher, General Counsel of the Port Authority, at the Port Authority Law Department, 4 World Trade Center, 150 Greenwich Street, 23rd Floor, New York, New York 10007. The Port Authority received it. United States Postal

Service records show the certified mailing delivered to the Port Authority's agent on June 25, 2026, and the return receipt, signed by the Port Authority's agent, records a delivery date of July 6, 2026. The notice set out Ms. Bronwyn's name and address and that of her attorney, the nature of the claim, the time when, the place where and the manner in which the claim arose, and the injuries and items of damage it then claimed. It described the November 11, 2025 confinement and the dispenser and grab bar condition, including the condition Ms. Bronwyn found on her return trip in May 2026. On October 23, 2026, Ms. Bronwyn swore before a notary public to a supplemental notice of claim setting out each item N.J.S.A. 32:1-164 and N.Y. Unconsol. Law § 7108 enumerate, including the physical injuries and out-of-pocket losses pleaded below. On October 27, 2026, Plaintiff served that sworn notice upon the Port Authority in the manner in which process may be served, by delivering it at the Port Authority's principal office, 4 World Trade Center, 150 Greenwich Street, 23rd Floor, New York, New York 10007, to a legal clerk who stated that she was authorized to accept service on the Port Authority's behalf. The sworn notice supplemented the notice already given and did not withdraw it. This action is commenced more than sixty days after the Port Authority received the June 2026 notice of claim and within one year after the accrual of each claim pleaded against the Port Authority.

## III. PARTIES

13. Plaintiff Rachel Bronwyn is a natural person and a citizen of California. She has primary progressive multiple sclerosis. She is retired and travels for personal reasons. She uses a manual wheelchair as her primary means of mobility outside the home, including when she travels through airports. She is, and at all relevant times was, an individual with a disability within the meaning of 42 U.S.C. § 12102 and 29 U.S.C. § 705(20)(B), a qualified individual with a disability within the meaning of 42 U.S.C. § 12131(2), and a person with a disability within the

meaning of N.J.S.A. 10:5-5(q), which expressly includes "physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device."

14. Defendant Munich Airport NJ LLC ("Munich") is a Delaware limited liability company registered to do business in New Jersey since January 17, 2019, New Jersey Entity Identification Number 0600457050. Its principal place of business is Terminal A, Newark Liberty International Airport, Newark, New Jersey 07114, and the address on its New Jersey corporate filing is 6 Earhart Drive, Unit 1, Newark, New Jersey 07114. As Munich has itself pleaded in this District, the Port Authority engaged it to provide management and related services for the newly constructed Terminal A and, in 2019, to provide management and operational services at Terminal A. Answer to Second Am. Compl. & Countercls., Countercls. ¶¶ 1, 10, *Universal Prot. Serv., LLC v. Munich Airport NJ LLC*, No. 2:23-cv-20135 (D.N.J. June 12, 2024), ECF No. 28. Munich describes itself as the terminal operator for Terminal A, responsible for airport operations, concessions and maintenance management there. Terminal A is a commercial facility within the meaning of 42 U.S.C. § 12181(2) and 28 C.F.R. § 36.104, and it houses places of public accommodation within the meaning of 42 U.S.C. § 12181(7) and 28 C.F.R. § 36.104. Munich operates both. Terminal A is a place of public accommodation under N.J.S.A. 10:5-5(l), which reaches "any public conveyance operated on land or water or in the air or any stations and terminals thereof," "any comfort station," and "any producer, manufacturer, wholesaler, distributor, retail shop, store, establishment, or concession dealing with goods or services of any kind."

15. Defendant the Port Authority of New York and New Jersey is a bi-state compact agency created by the Compact of 1921 between the States of New York and New Jersey with the consent of Congress. Its principal office is at 4 World Trade Center, 150 Greenwich Street, New

York, New York 10007. The Port Authority operates Newark Liberty International Airport. It holds the airport under a long-term lease, and it possesses and controls Terminal A and the land on which the terminal stands. It developed and paid for the terminal and had it designed and built. It is a "public entity" within the meaning of 42 U.S.C. § 12131(1)(B), which reaches "any department, agency, special purpose district, or other instrumentality of a State or States or local government." It is a recipient of federal financial assistance within the meaning of 29 U.S.C. § 794. The Port Authority is a body corporate and politic with the power to sue and be sued, to hold property, to contract and to incur debt. It generates its own revenues and pays its own debts, it may not pledge the credit of either State, and neither State is liable for its debts or for judgments against it.

## IV. FACTUAL ALLEGATIONS

### A. Ms. Bronwyn

16. Primary progressive multiple sclerosis advances without remission. In Ms. Bronwyn it substantially limits her ability to walk, stand, balance and perform manual tasks, and it is why she uses a wheelchair.

17. Three things bring Ms. Bronwyn to this part of the country. She graduated from Princeton University and returns for reunions and conferences. One of her closest friends lives in New Hope, Pennsylvania. And she holds a master's degree in art history, which takes her to exhibitions at the Metropolitan Museum of Art and the Museum of Modern Art in New York City. For Ms. Bronwyn, Newark is the best airport to fly into because of its access to public transportation. She travels through it when she returns to Princeton, and it serves her trips to New York City as well.

18. Her two most recent trips through Newark, in November 2025 and in May 2026, were both personal travel, and on them she passed through Terminal A at least three times: on arrival on November 11, 2025, on departure on November 14, 2025, and on departure on or about May 24, 2026. She intends to travel through Newark again. She wants to see the Brancusi exhibition at the Museum of Modern Art, which runs through February 27, 2027, and expects to make that trip on or about the weekend of February 12, 2027.

## B. Terminal A and the Defendants' Roles

19. Newark Liberty International Airport is a major commercial airport operated by the Port Authority. It serves tens of millions of passengers a year, among them travelers with disabilities who use manual and powered wheelchairs.

20. Terminal A is a new passenger terminal at Newark Liberty International Airport. The Port Authority developed it and paid for it. In February 2018 the Port Authority approved the award of a design-build contract for the terminal, and construction began in 2018. The terminal opened to commercial passenger traffic on January 12, 2023.

21. Those facts control which accessibility requirements apply. Each facility constructed by, on behalf of, or for the use of a public entity must be designed and constructed so that it is readily accessible to and usable by individuals with disabilities if its construction commenced after January 26, 1992. 28 C.F.R. § 35.151(a)(1). Terminal A's construction commenced in 2018. Because its physical construction commenced after March 15, 2012, the terminal was required to comply with the 2010 ADA Standards for Accessible Design (the "2010 Standards"). 28 C.F.R. § 35.151(c)(3). Title III imposes a parallel new-construction requirement "as applied to public accommodations and commercial facilities." 42 U.S.C. § 12183(a); 28 C.F.R. § 36.401(a)(1). Under Title III, too, the 2010 Standards govern. 28 C.F.R. § 36.406(a)(3). On

information and belief, any application for a building permit for Terminal A was certified complete or received after March 15, 2012, the Port Authority having approved the award of the terminal's design-build contract only in February 2018, and if no permit was required, the terminal's physical construction began after that date. The 2010 Standards consist of the 2004 ADA Accessibility Guidelines, 36 C.F.R. pt. 1191, apps. B and D (2009), together with the requirements of 28 C.F.R. § 35.151 or, under Title III, of 28 C.F.R. pt. 36, subpt. D. 28 C.F.R. §§ 35.104, 36.104.

22. Munich operates Terminal A. By its own description, it is the terminal operator, responsible for airport operations, concessions and maintenance management at Terminal A. On information and belief, the accessibility features of the terminal's public restrooms, including the accessible restroom with the adult changing table and the restrooms at Gate A14, are within its operational control.

23. The Port Authority possesses and controls Terminal A and operates the airport around it, and its own obligations under the Americans with Disabilities Act and Section 504 travel with that control. Hiring an operator does not shed them. A public entity may not discriminate on the basis of disability "directly or through contractual, licensing, or other arrangements." 28 C.F.R. § 35.130(b)(1).

## C. The November 11, 2025 Confinement

24. On November 11, 2025, Ms. Bronwyn flew from San Diego, California, to Newark, New Jersey, on United Airlines Flight UA1827, scheduled to arrive at 3:23 p.m. As a wheelchair user she was the last passenger off the aircraft. She waited for an aisle chair and then transferred into her own wheelchair.

25. Remaining within the secure area of Terminal A, she went to the accessible restroom with the adult changing table near Gate A28. The restroom was locked. A custodian had to find a supervisor with a key before Ms. Bronwyn could get in.

26. At about 4:45 p.m., Ms. Bronwyn prepared to leave. When she operated the interior door latch, the latch did not function. She could not open the door.

27. She pressed the emergency call button installed beside the door. She pressed it repeatedly, and she repeatedly pulled the emergency cord on the same panel. No one answered through the intercom, and no one came. She then started the timer on her telephone so that she would know how long she had been inside.

28. Ms. Bronwyn then called 911 from her cellular telephone. The dispatcher questioned why she was calling at 4:55 p.m. when her flight had arrived at about 3:23 p.m., and she had to retrace her steps that afternoon in an attempt to get him to believe her.

29. At about 5:00 p.m., still locked inside, she photographed the emergency call panel, the door latch, and herself in her wheelchair in the restroom. At about 5:30 p.m. she sent those photographs to her husband. He wrote back asking whether she was out yet. She answered that she was not.

30. Sometime into the confinement, Ms. Bronwyn began to hear people gathering on the other side of the door, and then a conversation about a key. Nobody knew where it was, and she could hear them laughing about that. No master key was ever produced. Ms. Whittaker later admitted to Ms. Bronwyn that she had to admonish the crowd, and that she warned the terminal staff that Ms. Bronwyn could hear them.

31. Port Authority Police officers arrived at about 5:19 p.m. They worked with Munich managers and cleaning personnel to find a key to the room, and none was located. At 5:33 p.m.

the Port Authority Police Department notified its Emergency Service Unit, requesting that it open the locked door. At about 6:14 p.m., Emergency Service Unit officers pried the door open with a crowbar.

32. Ms. Bronwyn emerged approximately ninety minutes after she had first tried to exit, into a crowd of at least twenty people that included airport employees and police officers.

33. The reporting officer was Police Officer Ryan Sawyer of the Port Authority Police Department, and Police Officer B. Levinson responded with him. A Port Authority Police sergeant was also on scene. The Department recorded the incident as Event Number 2025-683290.

34. The Terminal A duty manager on duty at the time was Tanika C. Whittaker. The Port Authority Police report identifies Ms. Whittaker and a second manager on scene, Michele Licciardi, as Munich managers.

35. The restroom failed in three independent ways on November 11, 2025:

a. The interior door latch did not permit Ms. Bronwyn to exit under her own operation. The 2010 Standards require that operable parts be "operable with one hand" and "not require tight grasping, pinching, or twisting of the wrist," with an activating force of five pounds maximum, 2010 Standards § 309.4, and § 404.2.7 applies that requirement to door "latches" and "locks" by cross-reference. A latch that does not release at all satisfies none of it. The requirement exists so that a traveler who cannot grasp, pinch or twist can let herself out, which is the use Ms. Bronwyn was denied.

b. The emergency call button installed beside the door did not summon a response. Ms. Bronwyn pressed it repeatedly and repeatedly pulled the emergency cord on

the same panel, and no one answered through the intercom and no one came. The button and cord are operable parts installed in an accessible room, and the 2010 Standards require operable parts "in accessible rooms and spaces" to comply with § 309. 2010 Standards § 205.1.

c. No functional master key for the restroom door was produced during the entire period of Ms. Bronwyn's confinement. Earlier that afternoon a supervisor had unlocked the restroom with a key so that Ms. Bronwyn could use it. During her confinement, neither the Port Authority Police nor the Munich managers and cleaning personnel working with them could locate a key, and the door was opened only by force.

36. Together those three failures held Ms. Bronwyn inside for approximately ninety minutes. The restroom was one Terminal A sets aside for travelers who need an accessible facility with an adult changing table. Its door latch was the hardware such a traveler has to be able to work alone.

37. The door hardware of an accessible restroom is a feature required to be readily accessible to and usable by persons with disabilities, 2010 Standards §§ 309.4, 404.2.7, and Defendants were required to "maintain in operable working condition" such features. 28 C.F.R. §§ 35.133(a), 36.211(a). The restroom was in service on November 11, 2025: Terminal A staff unlocked it for Ms. Bronwyn's use. On information and belief, no repair of its door hardware was underway, and nothing posted at the door warned travelers that its hardware could not be relied on.

38. For about ninety minutes Ms. Bronwyn sat alone in a locked room in a building full of people. For the first half hour she pressed a button that summoned no one and tried to make a 911 dispatcher believe her, not knowing whether help would come at all. After the police arrived,

nearly another hour passed while no one could find a key. It ended with police officers prying the door open with a crowbar and with Ms. Bronwyn coming out in front of at least twenty people. She suffered distress, humiliation and fear.

39. For Ms. Bronwyn, stress aggravates her primary progressive multiple sclerosis, and the confinement brought on an intense exacerbation of her symptoms. She experienced increased spasticity, which is intensely painful, and significantly increased nerve pain, and her medication relieved neither. Afterward, because of the spasticity, she could sleep only in intervals of forty-five to ninety minutes. She was exhausted and overheated, too exhausted even to get herself dinner. She also had difficulty transferring: the next morning she fell as she tried to transfer out of the shower at her hotel in Princeton, and she had to call 911 for emergency medical technicians.

40. She had planned to take public transportation from the airport to Princeton. After the confinement she had to take an Uber instead, which picked her up at Terminal A at 7:14 p.m. and brought her to Princeton at 8:09 p.m., at a cost of $133.71.

**D. The Same Violation, Six Months Later**

41. On November 11, 2025, after the trapping incident, Ms. Bronwyn identified to Ms. Whittaker a separate accessibility violation in a single-user accessible restroom immediately adjacent to the duty manager's office, near the luggage return carousels. The toilet paper dispenser in that restroom had been mounted so that it pressed against the adjacent grab bar, leaving no clearance between the dispenser and the bar and making the bar unusable.

42. Ms. Bronwyn had Ms. Whittaker sit down on the toilet seat in that restroom so that Ms. Whittaker would understand the problem.

43. Ms. Whittaker acknowledged the problem and repeatedly assured Ms. Bronwyn that it would be addressed and fixed.

44. On a return trip through Terminal A on or about May 24, 2026, Ms. Bronwyn attempted to use the accessible stall in the women's restroom at Gate A14. The toilet paper dispenser there was mounted so tightly against the adjacent grab bar that the bar could not be used.

45. The 2010 Standards set a dimension for exactly this condition. "The space between the grab bar and projecting objects below and at the ends shall be 1 1/2 inches (38 mm) minimum." 2010 Standards § 609.3. A dispenser mounted flush against the bar leaves no space at all. Section 604.7 adds that the outlet of a toilet paper dispenser "shall not be located behind grab bars." *Id.* § 604.7.

46. Ms. Bronwyn summoned a Munich employee, Jonathan Cruz, who came to the corridor immediately outside the restroom. Mr. Cruz's badge identification number is 6300761494.

47. A second Munich employee, identified as Cynthia, examined the installation, confirmed the violation in person, and photographed the dispenser pressed against the grab bar.

48. Suspecting the condition was not confined to one restroom, Ms. Bronwyn asked a male Munich employee, Carlos, to check the men's restroom directly across the corridor. He did, and reported the identical condition: the dispenser mounted flush against the grab bar.

49. This was the same condition Ms. Bronwyn had shown Ms. Whittaker on November 11, 2025. More than six months later, notwithstanding the duty manager's repeated assurances, the same condition was still present in the terminal, in two more restrooms.

50. Three restrooms in two parts of the terminal, two of them facing each other across a single corridor, carried the same noncompliant mounting. On information and belief, that is a

standard installation in Terminal A, not an isolated error, and, subject to confirmation by the survey Ms. Bronwyn seeks, the same condition exists in other public restrooms in the terminal.

**E. Notice and the Failure to Remediate**

51. On information and belief, the dispenser and grab bar condition was built into Terminal A and had been in place since the terminal opened in January 2023, in plain view in restrooms Defendants inspect and clean, and reasonable inspection of the terminal's accessible restrooms at any time before November 11, 2025 would have disclosed both that condition and the state of the accessible restroom door hardware. Whatever Defendants knew before that date, they had actual notice from November 11, 2025 forward. The confinement drew a Port Authority Police response that included a sergeant and the Emergency Service Unit, and it generated a police report. It brought two Munich managers, including the Terminal A duty manager, to the restroom door, and it unfolded in front of at least twenty people. The same day, Ms. Bronwyn showed the duty manager the dispenser and grab bar condition in person.

52. On information and belief, neither Defendant responded to that notice by surveying the terminal's restrooms, developing or implementing a written remediation plan, retraining personnel on emergency response or key control, or correcting the dispenser and grab bar condition Ms. Bronwyn had shown the duty manager.

53. On March 31, 2026, Plaintiff's counsel sent Munich a letter by email describing the November 11, 2025 confinement and the failures that caused it.

54. The sequence is short. On November 11, 2025, an accessible restroom in the terminal held a wheelchair user for about ninety minutes. The same day, she had the terminal's duty manager sit down on the toilet seat in another accessible restroom so that the duty manager would understand how a dispenser mounted against the grab bar made the bar unusable. The duty

manager repeatedly assured her it would be fixed. On March 31, 2026, counsel wrote to Munich about the confinement. Less than two months after that letter, and more than six months after the demonstration, the same dispenser condition was present in two more restrooms. Each Defendant knew that the rights of travelers with disabilities were substantially likely to be violated in Terminal A's restrooms, and each failed to act on what it knew.

55. The same condition Ms. Bronwyn identified on November 11, 2025 was present at Gate A14 in May 2026, in the women's restroom and, as a Munich employee reported, in the men's restroom across the corridor, and on information and belief it remains in place today. On information and belief, Defendants have also adopted no key-control protocol, no emergency-response protocol with a response-time standard and periodic testing, and no survey and remediation program that would keep what happened to Ms. Bronwyn from happening again.

56. Ms. Bronwyn personally encountered the inoperable door hardware of the accessible restroom on November 11, 2025, and she personally encountered the dispenser and grab bar condition that day in the restroom beside the duty manager's office and again in May 2026 in the women's restroom at Gate A14. On information and belief, the dispenser and grab bar condition persists in Terminal A's public restrooms, and the terminal still lacks the key-control and emergency-response protocols that would release a person confined in an accessible restroom within a reasonable time. When she next travels through Terminal A, she will again need to use its accessible restrooms.

## V. CAUSES OF ACTION

## COUNT I

## Violation of Title II of the Americans with Disabilities Act

## 42 U.S.C. § 12131 et seq.

## (Against the Port Authority of New York and New Jersey)

57. Plaintiff incorporates the allegations of Paragraphs 1 through 56 as if fully set forth here.

58. The Port Authority is a "public entity" under 42 U.S.C. § 12131(1)(B). It is an instrumentality of the States of New York and New Jersey, created by interstate compact with the consent of Congress, and the statute reaches an instrumentality "of a State or States."

59. Ms. Bronwyn is a "qualified individual with a disability" under 42 U.S.C. § 12131(2). She meets the essential eligibility requirements for the services, programs and activities the Port Authority provides at Newark Liberty International Airport, including transit through Terminal A.

60. The operation of Newark Liberty International Airport, including the provision and upkeep of Terminal A's public restrooms for passengers, is a service, program and activity of the Port Authority within the meaning of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130.

61. The Port Authority discriminated against Ms. Bronwyn by reason of her disability in each of the following ways:

   a. It failed to design and construct Terminal A so that it is readily accessible to and usable by individuals with disabilities, in violation of 28 C.F.R. § 35.151(a)(1) and the 2010 Standards, including, on information and belief, §§ 604.7 (dispensers), 609.3 (grab bar spacing), 309.4 (operable parts) and 404.2.7 (door and gate hardware).

b. It failed to maintain in operable working condition features of Terminal A required to be readily accessible to and usable by persons with disabilities, in violation of 28 C.F.R. § 35.133(a), including the interior door hardware of the accessible restroom in which Ms. Bronwyn was confined and the emergency call button and cord installed beside its door, operable parts that 2010 Standards § 205.1 requires to comply with § 309.

c. On information and belief, it maintained no key-control protocol that would allow personnel to release a person confined inside an accessible restroom within a reasonable time. Whatever protocol existed did not function on November 11, 2025.

d. It discriminated through its contractual arrangement with Munich, which does not relieve it of its own obligations. 28 C.F.R. § 35.130(b)(1).

e. On information and belief, after actual notice on November 11, 2025, it failed to survey Terminal A's public restrooms for accessibility compliance and failed to remediate the dispenser and grab bar condition of which it had been told.

62. The result of that conduct was to deny Ms. Bronwyn the meaningful access to Terminal A that the statute guarantees. A latch that will not open, a call button nobody answers, a key nobody can find, and grab bars left unusable months after the terminal's own manager was shown the defect are not the incidents of a program that is accessible to and usable by people with disabilities.

63. From November 11, 2025 forward the Port Authority knew that the rights of travelers with disabilities were substantially likely to be violated in Terminal A's accessible restrooms. Its own police officers arrived at about 5:19 p.m., worked with Munich managers and cleaning

personnel to find a key, found none, and called in the Emergency Service Unit, which did not get the door open until about 6:14 p.m. Its Police Department recorded the incident in a written report that night. The same day, the duty manager of the Port Authority's own terminal operator was shown the dispenser and grab bar condition and repeatedly promised a fix. Six months later the same condition stood in two more restrooms. By July 6, 2026, the Port Authority had received written notice, addressed to its General Counsel, of both the confinement and the dispenser and grab bar condition. On information and belief, the Port Authority has not surveyed Terminal A's restrooms, adopted a key-control or emergency-response protocol, or corrected the dispenser and grab bar condition. The Port Authority acted with deliberate indifference to Ms. Bronwyn's federally protected rights.

64. That conduct confined Ms. Bronwyn in the accessible restroom for approximately ninety minutes on November 11, 2025, exposed her to a continuing violation at Gate A14 in May 2026, and caused her physical injury, emotional distress, humiliation, fear, physical discomfort, dignitary harm and out-of-pocket loss.

65. Ms. Bronwyn is entitled to compensatory damages, including damages for her physical injuries and her economic and out-of-pocket losses, and to declaratory and injunctive relief, attorneys' fees, costs and litigation expenses under 42 U.S.C. §§ 12133 and 12205 and 29 U.S.C. § 794a.

**COUNT II**

**Violation of Title III of the Americans with Disabilities Act**

**42 U.S.C. § 12181 et seq.**

**(Against Munich Airport NJ LLC)**

66. Plaintiff incorporates the allegations of Paragraphs 1 through 56 as if fully set forth here.

67. Terminal A is a commercial facility within the meaning of 42 U.S.C. § 12181(2) and 28 C.F.R. § 36.104. Its operations will affect commerce, and it is intended for nonresidential use, including by Munich, a private entity.

68. Terminal A also houses places of public accommodation within the meaning of 42 U.S.C. § 12181(7) and 28 C.F.R. § 36.104. Its restaurants, bars and other food and drink concessions are establishments "serving food or drink" under 42 U.S.C. § 12181(7)(B), and its retail stores are "sales or rental establishment[s]" under § 12181(7)(E). On information and belief, its service tenants are "service establishment[s]" under § 12181(7)(F).

69. Terminal A is also served by bus. The airport's AirTrain does not connect directly to Terminal A. Travelers coming from the AirTrain reach the terminal by a covered pathway or by a free shuttle bus that runs between Terminal A and the Parking A garage, which is also the airport's rental car center, and that arrives approximately every five minutes. Shuttle buses also replace the AirTrain whenever AirTrain service is unavailable.

70. A "terminal, depot, or other station used for specified public transportation" is a place of public accommodation. 42 U.S.C. § 12181(7)(G); 28 C.F.R. § 36.104. "Specified public transportation" means "transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis." 42 U.S.C. § 12181(10). Terminal A is a station used for the regular shuttle bus service described above, and it is therefore a place of public accommodation under § 12181(7)(G) as well.

71. Munich operates Terminal A, including its public restrooms, and it manages the terminal's concessions. It is therefore subject to 42 U.S.C. §§ 12182(a) and 12183(a).

72. Section 12183(a)(1) makes it discrimination, as applied to public accommodations and commercial facilities, to fail to design and construct facilities for first occupancy later than thirty months after July 26, 1990 that are readily accessible to and usable by individuals with disabilities, and the implementing regulation reaches facilities designed and constructed for first occupancy after January 26, 1993. 28 C.F.R. § 36.401(a)(1). Terminal A was first occupied in January 2023, and on information and belief, as designed and constructed it does not comply with the 2010 Standards, including §§ 604.7, 609.3, 309.4 and 404.2.7. The Port Authority engaged Munich in 2019, while the terminal was under construction, to provide management and operational services at Terminal A, and on information and belief Munich participated in the terminal's completion, activation and first occupancy. Munich's liability under the paragraphs that follow does not depend on this subsection.

73. A separate obligation runs regardless of how the terminal was built. A public accommodation "shall maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part." 28 C.F.R. § 36.211(a). The door hardware of an accessible restroom is such a feature, 2010 Standards §§ 309.4, 404.2.7, and so are the operable parts of an emergency call system installed in an accessible restroom, *id.* § 205.1. Munich did not maintain the door hardware or the emergency call system of the restroom in which Ms. Bronwyn was confined in operable working condition.

74. Munich further discriminated against Ms. Bronwyn in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of Terminal A, in violation of 42 U.S.C. § 12182(a), by failing to remediate the dispenser and grab bar violations in the terminal's public restrooms after actual notice on November 11, 2025 and after the May 2026

confirmation at Gate A14, and, on information and belief, by failing to adopt any key-control or emergency-response protocol after that notice and after counsel's letter of March 31, 2026.

75. Ms. Bronwyn has standing to seek injunctive relief. She personally encountered the barriers described above in the accessible restroom in which she was confined, in the restroom beside the duty manager's office and in the women's restroom at Gate A14. She passed through Terminal A again on November 14, 2025 and on or about May 24, 2026, and she expects to return on or about the weekend of February 12, 2027, for the reasons set out above. On information and belief, the dispenser and grab bar violations persist, and the terminal still lacks key-control and emergency-response protocols that would release a person confined in an accessible restroom within a reasonable time.

76. Ms. Bronwyn is entitled to declaratory and injunctive relief, attorneys' fees, costs and litigation expenses under 42 U.S.C. §§ 12188(a) and 12205, including an order requiring Munich to survey every public restroom in Terminal A, to implement a written remediation plan addressing each violation identified, and to retrain personnel on accessibility, emergency response and key control.

**COUNT III**

**Violation of Section 504 of the Rehabilitation Act of 1973**

**29 U.S.C. § 794**

**(Against the Port Authority of New York and New Jersey)**

77. Plaintiff incorporates the allegations of Paragraphs 1 through 56 as if fully set forth here.

78. Section 504 provides that no otherwise qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of,

or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

79. The Port Authority receives federal financial assistance. Its financial statements for 2025 report amounts due to it from the Federal Aviation Administration for capital projects at its aviation facilities, and capital contributions from the Federal Transit Administration and the Federal Emergency Management Agency for Superstorm Sandy restoration and resiliency projects on its PATH rail system. Its airports also received federal funding under the American Rescue Plan Act of 2021, which the Port Authority applied to eligible aviation operating expenses through 2024.

80. Under Section 504, a "program or activity" means "all of the operations of" a "department, agency, special purpose district, or other instrumentality of a State or of a local government," "any part of which is extended Federal financial assistance." 29 U.S.C. § 794(b), (b)(1)(A). The Port Authority is an instrumentality of the States of New York and New Jersey. All of its operations, including its operation of Newark Liberty International Airport and of Terminal A and its public restrooms, are therefore a program or activity receiving federal financial assistance, without regard to which federal dollar was spent where. In the alternative, the Port Authority is an entity "established by two or more of the entities described in paragraph (1), (2), or (3)" of 29 U.S.C. § 794(b), and all of its operations are a program or activity under § 794(b)(4).

81. Ms. Bronwyn is an "otherwise qualified individual with a disability" within the meaning of 29 U.S.C. §§ 705(20)(B) and 794.

82. Through the conduct described above, the Port Authority excluded Ms. Bronwyn from participation in its airport operations at Newark Liberty International Airport, denied her the

benefits of those operations, and subjected her to discrimination under that program, by reason of her disability.

83. The Port Authority's conduct was the product of deliberate indifference. It knew, no later than November 11, 2025, that a federally protected right was substantially likely to be violated in Terminal A, and it failed to act on that knowledge.

84. Ms. Bronwyn is entitled to compensatory damages, including damages for her physical injuries and her economic and out-of-pocket losses, and to declaratory and injunctive relief, attorneys' fees and costs under 29 U.S.C. § 794a.

**COUNT IV**

**Violation of the New Jersey Law Against Discrimination**

**N.J.S.A. 10:5-1 et seq.**

**(Against Munich Airport NJ LLC)**

85. Plaintiff incorporates the allegations of Paragraphs 1 through 56 as if fully set forth here.

86. The Law Against Discrimination makes it unlawful "[f]or any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation, directly or indirectly, to refuse, withhold from, or deny to any person any of the accommodations, advantages, facilities, or privileges thereof, or to discriminate against any person in the furnishing thereof," on account of disability. N.J.S.A. 10:5-12(f)(1).

87. Terminal A is a place of public accommodation under N.J.S.A. 10:5-5(l). The statute reaches "any public conveyance operated on land or water or in the air or any stations and terminals thereof," and it separately reaches "any comfort station" and "any producer, manufacturer, wholesaler, distributor, retail shop, store, establishment, or concession dealing

with goods or services of any kind." The enumeration is prefaced by "shall include, but not be limited to."

88. Munich is the operator and manager of Terminal A and, with respect to the Port Authority, its agent. It is within N.J.S.A. 10:5-12(f)(1).

89. Ms. Bronwyn has a disability within the meaning of N.J.S.A. 10:5-5(q).

90. Munich denied Ms. Bronwyn the accommodations, advantages, facilities and privileges of Terminal A on account of her disability through the conduct described above.

91. Munich's conduct was especially egregious, and its upper management actually participated in it or was willfully indifferent to Ms. Bronwyn's rights. Ms. Whittaker was the Terminal A duty manager, and the Port Authority Police report identifies her as a Munich manager. On information and belief, the duty manager is the person Munich puts in charge of terminal operations on her shift. Ms. Whittaker and a second Munich manager were at the restroom door during the confinement, and neither could produce a key. As people outside the door laughed about the missing key, Ms. Whittaker had to admonish the crowd and warn the terminal staff that Ms. Bronwyn could hear them. The same day she was shown the dispenser and grab bar violation in person, sat down on the toilet seat so that she would understand the problem, and repeatedly assured Ms. Bronwyn that it would be fixed.

92. Counsel's March 31, 2026 letter, addressed to Munich Airport NJ LLC itself, then put Munich on written notice of the confinement and the failures that caused it. On information and belief, no officer, executive or other policy-level decisionmaker of Munich ordered a survey of the terminal's restrooms, ordered the dispenser and grab bar condition corrected, or adopted any key-control or emergency-response protocol to prevent a recurrence of the confinement, and the

dispenser and grab bar condition was present at Gate A14 when Ms. Bronwyn returned in May 2026.

93. As a direct and proximate result, Ms. Bronwyn suffered physical harm, emotional distress, humiliation, fear, physical discomfort, dignitary harm and out-of-pocket loss.

94. Munich's acts and omissions were accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by them. N.J.S.A. 2A:15-5.12(a). On information and belief, Munich's failure to correct the dispenser and grab bar condition after its duty manager had been shown it and had promised a fix was deliberate, and it was made with knowledge of a high degree of probability of harm to travelers who use wheelchairs, who depend on grab bars to transfer safely, and with reckless indifference to the consequences. *See* N.J.S.A. 2A:15-5.10.

95. Ms. Bronwyn is entitled to compensatory damages, including damages for emotional distress, to all remedies available in common law tort actions under N.J.S.A. 10:5-13(a)(2)(b), to punitive damages, to declaratory and injunctive relief, and to attorneys' fees under N.J.S.A. 10:5-27.1 and costs.

**COUNT V**

**Negligence**

**New Jersey Common Law**

**(Against Munich Airport NJ LLC)**

96. Plaintiff incorporates the allegations of Paragraphs 1 through 56 as if fully set forth here.

97. As the operator of Terminal A, responsible for airport operations, concessions and maintenance management there, Munich owed Ms. Bronwyn, a member of the traveling public lawfully on the premises, a duty of reasonable care in the operation, maintenance and management of the terminal's facilities.

98. That duty included operating and maintaining accessible restrooms so that they do not trap the people who use them, keeping an installed emergency communication system in working order, maintaining a key-control protocol that allows personnel to free a confined person within a reasonable time, inspecting and maintaining restroom hardware, and remediating known hazards.

99. Munich breached that duty. It permitted door hardware that would not release. It failed to maintain an emergency call system that would summon help. No one could locate a key to release Ms. Bronwyn. It did not inspect for or correct the dispenser and grab bar condition, despite the notice it received on November 11, 2025 and again in May 2026, and, on information and belief, it adopted no key-control or emergency-response protocol after the notice it received on November 11, 2025 and on March 31, 2026.

100. Those breaches were the actual and proximate cause of Ms. Bronwyn's confinement and of the harm she suffered.

101. Ms. Bronwyn is entitled to compensatory damages, including damages for physical harm and physical discomfort, emotional distress, humiliation, fear and out-of-pocket loss. Those damages include the exacerbation of her multiple sclerosis symptoms and the fall described above.

## COUNT VI

## Negligence

## New Jersey Common Law

## (Against the Port Authority of New York and New Jersey)

102. Plaintiff incorporates the allegations of Paragraphs 1 through 56 as if fully set forth here.

103. New York and New Jersey have consented to the Port Authority's liability for tortious acts "to the same extent as though it were a private corporation." N.J.S.A. 32:1-162; N.Y.

Unconsol. Law § 7106. The Port Authority is accordingly subject to the same liability as a private party in possession and control of the terminal.

104. The Port Authority possesses and controls Terminal A and the land on which it stands. This Count rests on the condition and upkeep of those premises.

105. As the party in possession and control of Terminal A and the operator of Newark Liberty International Airport, the Port Authority owed Ms. Bronwyn, a member of the traveling public lawfully on the premises, a duty of reasonable care to maintain the terminal in a reasonably safe condition, including the door hardware and emergency call systems of its accessible restrooms.

106. The Port Authority breached that duty. It built and controls a terminal whose accessible restroom door would not open from the inside and whose emergency call system produced no response. After November 11, 2025 it knew, and on information and belief it still did not inspect the terminal's other restrooms or correct the dispenser and grab bar condition it had been told about.

107. That breach was an actual and proximate cause of Ms. Bronwyn's confinement and of the harm she suffered.

108. Ms. Bronwyn is entitled to compensatory damages, including damages for physical harm and physical discomfort, emotional distress, humiliation, fear and out-of-pocket loss. Those damages include the exacerbation of her multiple sclerosis symptoms and the fall described above.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Rachel Bronwyn respectfully requests that this Court enter judgment in her favor and against Defendants Munich Airport NJ LLC and the Port Authority of New York and New Jersey, and award the following relief:

A. A declaration that Defendants have violated Title II of the Americans with Disabilities Act, Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the New Jersey Law Against Discrimination and New Jersey common law, each as pleaded above;

B. A permanent injunction requiring Defendants, each to the extent of its own responsibilities, to:

1. retain a qualified independent accessibility consultant to survey every public restroom in Terminal A at Newark Liberty International Airport against the 2010 ADA Standards for Accessible Design;

2. produce a written report of that survey identifying every violation found, with photographs and dimensioned drawings as appropriate;

3. submit to the Court a written remediation plan addressing each violation identified, with completion deadlines and verification procedures;

4. implement that plan in full;

5. adopt and implement a written key-control protocol for accessible restrooms in Terminal A that ensures personnel can release a confined person within a reasonable time;

6. adopt and implement a written emergency-response protocol for accessible restroom emergency call systems, with a documented response-time standard and periodic functionality testing;

7. retrain all relevant Terminal A personnel on accessibility, emergency response and key control, with periodic refresher training; and

8. report compliance to the Court, which should retain jurisdiction to monitor and enforce the injunction;

C. Compensatory damages in an amount to be proven at trial against the Port Authority under Counts I, III and VI, and against Munich Airport NJ LLC under Counts IV and V, including damages for emotional distress, humiliation, fear, physical harm and discomfort, dignitary harm and out-of-pocket loss, and including under Counts I and III damages for Ms. Bronwyn's physical injuries and her economic and out-of-pocket losses;

D. Punitive damages against Munich Airport NJ LLC under Count IV;

E. Attorneys' fees, expert fees, litigation expenses and costs under 42 U.S.C. §§ 12133 and 12205, 29 U.S.C. § 794a, and N.J.S.A. 10:5-27.1;

F. Pre-judgment and post-judgment interest as allowed by law; and

G. Such other and further relief as the Court deems just and proper.

## VII. JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable, pursuant to Federal Rule of Civil Procedure 38(b).

Dated: November 10, 2026

Respectfully submitted,

EISENBERG & BAUM, LLP

By: s/ Andrew Rozynski
Andrew Rozynski, Esq.
32 Union Square East, Penthouse
New York, NY 10003
(212) 353-8700
arozynski@eandblaw.com

Attorneys for Plaintiff Rachel Bronwyn